MARGARET M. FLOYD, ADMINISTRATRIX (ESTATE OF JEWELL E. FLOYD) *v.* FRUIT INDUSTRIES, INC., ET AL.

WYNNE, C. J., BALDWIN, DALY, KING and MURPHY, Js.

Argued October 3—decided December 3, 1957

*John J. Hunt,* with whom was *Grant Titsworth,* for the appellant-appellee (plaintiff).

*George F. Lowman,* with whom were *Adrian W. Maher* and *John F. Spindler,* for the appellant-appellee (defendant Ruscoe).

*Joseph L. Melvin,* with whom was *Robert F. Quimby,* for the appellees (named defendant et al.).

KING, J. This was an action claiming damages for the instantaneous death of the plaintiff's decedent. He was killed while he was a passenger in a motor car owned and operated by the defendant Earl S. Ruscoe which collided with a tractor-trailer truck owned by the defendant Fruit Industries, Inc., and operated by the defendant Sidney L. Masters. Since Masters' agency was admitted in the pleadings, it is unnecessary further to consider, in this opinion, the defendant owner of the truck. The collision occurred in the town of Darien in or near an intersection of the westbound lane of the Boston Post Road, along which Masters' truck was proceeding, and a crossover from the eastbound lane. Ruscoe's Buick convertible was proceeding in a northerly direction on the crossover. Masters claimed that Ruscoe went through a stop sign and was in motion at the time of the collision, while Ruscoe claimed that his car was stationary with its front end about at the southerly edge of the cement portion of the westbound lane of the Post Road. The jury returned a plaintiff's verdict in the amount of $100,000 against the defendant Ruscoe only, and a verdict in favor of the defendants Fruit Industries, Inc., and Masters. Both the plaintiff and the defendant Ruscoe appealed.

The plaintiff has made a wholesale attack on the finding. Since it is substantially adequate for the purpose of enabling this court to review the basic assignments of error, no material changes will be made. *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.,* 143 Conn. 468, 474, 123 A.2d 760; *Fairbanks* v. *State,* 143 Conn. 653, 655, 124 A.2d 893.

The court prefaced its instructions on the law governing the respective motor vehicles at and approaching the intersection by stating that it had come to "a very important element in this case and possibly the most important element." Masters was approaching the intersection from Ruscoe's right and claimed a statutory right of way. *Peckham* v. *Knofla,* 130 Conn. 646, 649, 36 A.2d 740; *McNaught* v. *Smith,* 127 Conn. 450, 454, 17 A.2d 771; *Clement* v. *DelVecchio,* 140 Conn. 274, 278, 99 A.2d 123. The situation was further complicated by the presence of a stop sign governing traffic about to enter the westbound lane of the Post Road from the south, as was Ruscoe. One of the plaintiff's specifications of negligence charged that Ruscoe failed to stop in accordance with the mandate of that sign under the rule of cases such as *Clement* v. *DelVecchio,* supra. In other specifications, the plaintiff charged Ruscoe with negligence as to lookout and control, in failing to grant Masters the right of way, and in using excess speed through the intersection. The plaintiff's specifications of Masters' negligence included charges of negligence as to the use of a statutory right of way, under the rule of cases such as *Jackson* v. *Brown,* 106 Conn. 143, 146, 137 A. 725, and *Mulvey* v. *Barker,* 138 Conn. 551, 554, 86 A.2d 865, and as to speed, control, lookout, failure to warn, failure to stop, and reckless driving. It is obvious that in considering these specifications of negligence the

jury had to keep in mind the law as to the statutory right of way at an intersection. There was no error in the court's pointing out to the jury the importance of this question. It could hardly have performed its duty had it not done so.

The plaintiff also assigned error in the court's claimed failure to grant a request to charge that "[i]n situations involving great danger, great care is required." The court, after defining common-law negligence generally, charged that "in a situation of danger the care must be proportionate to the danger." This was a sufficient compliance with the request and was better phrased.

The defendant Ruscoe assigned as error the court's failure to give a charge, as requested, covering his claim that Masters had violated § 2425 of the General Statutes, which prescribes the number of hours a driver of a commercial vehicle may operate it without a period of rest. This assignment of error, however, was not touched on in Ruscoe's brief and is treated as abandoned. *Somers* v. *Hill,* 143 Conn. 476, 480, 123 A.2d 468.

In other assignments of error the plaintiff and the defendant Ruscoe complain of the exclusion of certain questions asked of the witness Jonathan A. Karas, a professor of physics who had had experience in analyzing automobile accidents to determine their causes, effects and conditions. He was offered as an expert by the plaintiff on matters involving the speed, movement and courses of the motor vehicles in the present case as computed or deduced from claimed facts such as marks, or the absence of them, on the highway. The court permitted the witness to testify on direct examination that if it were assumed that the vehicles, after the impact, had slid straight ahead in the truck's direction of

travel, he could calculate with reasonable accuracy, from certain data as to the coefficient of friction of rubber and the road surface which he possessed, that the speed of the truck at the time of impact was at least 34.2 miles per hour. He was then asked as to the effect on this estimate of certain sidewise movements which the truck apparently had made after the impact, and of the fact that after impact the Buick was dragged along with the truck until both came to rest. He was allowed to state that the estimated speed of the truck would be increased by these factors. He was not allowed to testify as to the amount of the increase in miles per hour, nor to answer certain other questions concerning the probable and possible courses, speeds, movements and positions of the vehicles.

The court did not exclude this testimony on the ground that it was basically not a proper subject for expert testimony; *Taylor* v. *Town of Monroe,* 43 Conn. 36, 44; *Stephanofsky* v. *Hill,* 136 Conn. 379, 383, 71 A.2d 560; *State* v. *Grosso,* 139 Conn. 229, 233, 93 A.2d 146; nor on the ground that the witness lacked the necessary general qualifications in the field in which he was asked to testify. *Coffin* v. *Laskau,* 89 Conn. 325, 329, 94 A. 370; *Wray* v. *Fairfield Amusement Co.,* 126 Conn. 221, 224, 10 A.2d 600; *Rogoff* v. *Southern New England Contractors Supply Co.,* 129 Conn. 687, 691, 31 A.2d 29; *State* v. *Nelson,* 139 Conn. 124, 128, 90 A.2d 157. The finding makes it clear that the real ground of exclusion was that none of the hypothetical questions to which objections were sustained was properly framed in the light of the evidence so as to be likely to do otherwise than confuse the jury, and the court intimated that in view of the uncertainty as to the courses and movements of both the truck and the attached

Buick, it would probably be impossible to frame a satisfactory hypothetical question. While at one point the court indicated that it was following the case of *Stephanofsky* v. *Hill,* supra, there is nothing to indicate that had counsel been able to frame a satisfactory hypothetical question it would have been excluded. The determination of the admissibility of a hypothetical question, at least except in extreme cases, is not to be made by the application of any rule of thumb. *Goodrich Oil Burner Mfg. Co.* v. *Cooke,* 126 Conn. 551, 554, 12 A.2d 833. Rather, it calls for the exercise of a sound discretion as to whether the question, even though it does not contain all of the facts in evidence, presents the facts in such a manner that they bear a true and fair relationship to each other and to the whole evidence in the case; *Barber's Appeal,* 63 Conn. 393, 409, 27 A. 973; *Jackson* v. *Waller,* 126 Conn. 294, 306, 10 A.2d 763; is not so worded as to be likely to mislead or confuse the jury; and is not so lacking in the essential facts as to be without value in the decision of the case. *Goodrich Oil Burner Mfg. Co.* v. *Cooke,* supra; *Johnson* v. *Toscano,* 144 Conn. 582, 591, 136 A.2d 341. The court did not abuse its discretion in excluding the questions.

After the witness Karas had testified on direct examination to the limited extent hereinbefore indicated, he was cross-examined on behalf of the defendant Ruscoe, who complains of the exclusion of one question. This in effect asked how far the truck would skid, with ten of its twelve wheels locked, in a straight-line skid without regard to any fact other than the coefficient of friction on the road. The court, on objection, excluded the question. Our rule as to hypothetical questions on cross-examination of an expert witness is clearly stated in *Living-*

*stone* v. *New Haven,* 125 Conn. 123, 127, 3 A.2d 836. The purpose of such cross-examination is to test the credibility of the witness and the accuracy and reasonableness of his direct testimony. There was no claim that the Buick was not dragged along by the truck. We cannot say that the court could not reasonably decide that an answer to the question would throw little light on the accuracy or reasonableness of the direct testimony. It follows that the exclusion of the question fell within the limits of the discretion accorded by our rule. In brief and oral argument, some claim seems to be made that the defendant Ruscoe was prevented by the ruling from attempting to obtain evidence which would support his theory of the case. So far as this attempt involved a departure from the proper scope of a cross-examination, it would require that Ruscoe make the witness his own, and, in the absence of consent by the other parties, that he elicit the evidence as part of his own case. *Finch* v. *Weiner,* 109 Conn. 616, 617-620, 145 A. 31. He made no effort to do so. He also claims error based on the exclusion of the questions asked by the plaintiff on the witness' direct examination. Regardless of any other considerations, Ruscoe's failure to make any claim, as well as to take an exception to any of the rulings, on the plaintiff's direct examination precludes consideration of any claim on his part of error in the rulings excluding the plaintiff's questions. Practice Book § 155. Under the procedure followed, the trial court had no warning of any of the claims now being made by this defendant, nor did it pass on them. Were such claims now to receive consideration here, the whole salutary purpose of the rule would be thwarted.

The plaintiff assigned error in the failure of the

court to order the witness Henry D. Creech excluded from the courtroom during the testimony of his fellow operator of the truck, the defendant Masters. Since this assignment of error was not pursued in the plaintiff's brief, it is treated as abandoned. *Somers* v. *Hill,* 143 Conn. 476, 480, 123 A.2d 468.

The plaintiff's remaining assignments of error have to do with the proper assessment of damages for instantaneous death under our wrongful death statute. Cum. Sup. 1955, § 3230d (now Public Acts 1957, No. 532). The determination of these assignments depends upon a consideration of the basic principles of our act. "Under our [wrongful death] statute . . . the cause of action 'which the executor or administrator is permitted to pursue is not one which springs from the death [as is the case under wrongful death statutes based on Lord Campbell's Act, 9 & 10 Vict. c. 93]. It is one which comes to the representative by survival. The right of recovery for the death is as for one of the consequences of the wrong inflicted upon the decedent.' . . . [T]he cause of action . . . is a continuance of that which the decedent could have asserted had he lived . . . ." *Chase* v. *Fitzgerald,* 132 Conn. 461, 467, 45 A.2d 789. A right of action for damages for personal injuries survived to the decedent's personal representative by virtue of § 3235d of the 1955 Cumulative Supplement, although here, since death was instantaneous, nominal damages only could have been recovered. See *Goodsell* v. *Hartford & N. H. R. Co.,* 33 Conn. 51, 55; *McElligott* v. *Randolph,* 61 Conn. 157, 159, 22 A. 1094; *Kling* v. *Torello,* 87 Conn. 301, 305, 87 A. 987. Our wrongful death statute adds to that cause of action, as an element of damage, the death itself, which was not recognized as an element of damage at common law. *Connecticut*

*Mutual Life Ins. Co.* v. *New York & N. H. R. Co.,* 25 Conn. 265, 273; *Kling* v. *Torello,* supra, 306; *Lucier* v. *Hittleman,* 125 Conn. 635, 636, 7 A.2d 647.

To avoid misunderstanding, it perhaps should be pointed out that where damages for death itself are claimed in an action based on our wrongful death statute, recovery of any ante-mortem damages flowing from the same tort must be had, if at all, in one and the same action. In other words, there cannot be a recovery of damages for death itself under the wrongful death statute in one action and a recovery of ante-mortem damages, flowing from the same tort, in another action brought under § 3235d. *Goodsell* v. *Hartford & N. H. R. Co.,* supra, 56; *McElligott* v. *Randolph,* supra. Because of this, the limitation on the amount of recovery which was formerly contained in our wrongful death statute and which, although changed in amount from time to time, persisted until 1951 (Cum. Sup. 1951, § 1392b), was construed as an over-all limitation on the amount of recovery in the one action seeking damages for wrongful death, even though ante-mortem damages were also claimed therein. *Kling* v. *Torello,* supra, 306; see 2 Harper & James, Torts, § 25.17. That this construction was in accord with the legislative will is indicated by the fact that in § 4 of chapter 193 of the Public Acts of 1903, enacted long after the decisions in the *Goodsell* and *McElligott* cases, supra, the language of the wrongful death statute was amplified to make it in terms applicable whether the death was "instantaneous or otherwise."

With this basic outline of our law in mind, we turn to the assignments of error involving the proper assessment of damages. Damages for wrongful death, as such, are allowed as compensation for the destruction of the decedent's capacity to carry on

life's activities, including his capacity to earn money, as he would have if he had not been killed. *Chase* v. *Fitzgerald,* supra, 470. In the case of one who is gainfully employed, especially one who earns a relatively large income, as did the present decedent, the destruction of earning capacity may well be the principal element of recovery resulting from the death. Id., 468. But we have consistently pointed out that damages for wrongful death are not restricted to those arising from the mere destruction of earning capacity. Some damages are recoverable for death itself, even though instantaneous, without regard to earnings or earning capacity. *Broughel* v. *Southern New England Telephone Co.,* 73 Conn. 614, 616, 48 A. 751; *Hesse* v. *Meriden, S. & C. Tramway Co.,* 75 Conn. 571, 576, 54 A. 299; *Schrayer* v. *Bishop,* 92 Conn. 677, 682, 104 A. 349; *O'Connor* v. *Zavaritis,* 95 Conn. 111, 116, 110 A. 878; *Lengel* v. *New Haven Gas Light Co.,* 142 Conn. 70, 77, 111 A.2d 547. In the case of *Chase* v. *Fitzgerald,* supra, involving the death of a married woman who had neither an earned income nor any reasonable prospect of acquiring one, the defendants in effect claimed that the jury's assessment of damages for her death was restricted to the element of the destruction of earning capacity. This claim was held erroneous and led to a re-examination of our rule and an attempt to restate it so as to facilitate its application in the case of housewives and others who might not have substantial earning capacity. At the same time, we amplified and clarified our settled rule allowing recovery of damages for death itself, apart from its effect on earning capacity. *Chase* v. *Fitzgerald,* supra, 470.

While a suit for damages for wrongful death must be brought by the executor or administrator and

any recovery passes into the decedent's estate for distribution in accordance with the special rule provided in § 2947d of the 1955 Cumulative Supplement, damages for wrongful death, under the basic survivorship theory of our law, are assessed on the basis of the loss to the decedent had he lived, and, except in that sense, not on the basis of loss to his estate. It follows that in many respects damages are assessed in the same way as in a nonfatal case involving a total and permanent destruction of capacity to carry on life's activities. Whether this destruction was caused by death or by permanent, total disability is in general of little importance if the destruction is complete and permanent, as, of course, it must be in a fatal case.

When destruction of earning capacity, that is, the capacity to carry on the particular activity of earning money, is to be compensated for, the inquiry in the first instance is as to probable net earnings, in the ordinary sense of that phrase as used in accounting practice, during the probable lifetime. But in measuring a person's actual loss from a permanent and total destruction of earning capacity, whether by death or injury, there is an important factor which must be offset against probable net earnings. That factor is any saving in income tax liability which can properly be attributed to a cessation of earned income. In the case of one of high earning capacity, like the decedent, this is an important factor to be offset against what would otherwise be his loss from the destruction of his earning capacity. The net profits, before taxes, of the decedent, who was a cotton broker, for the five years preceding his death averaged in excess of $50,000 a year. In one of these years his federal tax on earned net income ran above $35,000, and his New York state income tax

above $3400. Obviously, if loss to the decedent had he lived is the test, as it must be under the survivorship theory of our law, the probable income taxes of the decedent must be deducted from his probable lifetime net earnings to get any fair or proper basis for assessing reasonable compensation for the loss caused by the destruction of his earning capacity. It would be difficult to conceive of a more unjust, unrealistic or unfair rule than one which would lead a jury to base their allowance of reasonable compensation for the destruction of earning capacity on the hypothesis that no income taxes would be paid on net earnings. For all practical purposes, the only usable earnings are net earnings after payment of such taxes.

It is true that in some jurisdictions, as pointed out by the plaintiff, evidence of income taxes has been held inadmissible, usually on the ground that it related to a factor too uncertain, conjectural or speculative in character to be of benefit in the assessment of damages for the permanent impairment or destruction of earning capacity. This was the rationale of the decision in *Stokes* v. *United States,* 144 F.2d 82, 87, cited and stressed by the plaintiff. The case arose in the second circuit and is perhaps generally regarded as a leading case on the point. Its holding was followed in the eighth circuit in *Chicago & N.W. Ry. Co.* v. *Curl,* 178 F.2d 497, 502. We are not impressed by the reasoning of these cases. The factor in question is no more uncertain, speculative or conjectural than many of the other factors which must be, and in this case were, submitted to the consideration of the jury under our rule as set forth in cases such as *Sims* v. *Smith,* 115 Conn. 279, 285, 161 A. 239. Our view is in agreement with that expressed in 2 Harper & James, Torts, § 25.12.

The offsetting factor of the probable income taxes on the probable net earnings should, in a proper case, be called to the attention of the jury in the same way as the other offsetting factors mentioned in *Sims* v. *Smith,* supra.

The court, in its charge, cautioned the jury against attempting to use evidence which the defendants had offered concerning income tax payments in any arithmetical computation because of the inherent uncertainty in the amount of taxes which the decedent would have had to pay, had he lived, in the light of possible changes in his status as to dependents, legislative changes in the rate and incidence of the income tax, and other factors not susceptible of any exact estimate. The plaintiff claimed that a deduction of probable income taxes is no more proper in a fatal case than in a nonfatal case involving a total destruction of earning capacity. The short answer to this claim is that we have never held that such a deduction should not be made in such a nonfatal case.

There was no error in allowing the defendants, on cross-examination of an accountant who was called by the plaintiff and who on direct examination had testified to the decedent's net profits from his occupation, to elicit the fact that these figures were without deduction of either the state or the federal income tax; nor in admitting evidence offered by the defendants as to the amount of the income taxes on those net profits; nor in the court's treatment of this evidence as to income taxes, as hereinbefore outlined, in the charge.

One important element of expense which ceases upon death, in the case of a fatal injury sustained by one subject to the expense of maintaining himself, is personal living expenses. If we bear in mind the

underlying survivorship theory of our law, it becomes obvious that if fair compensation is to be made for the loss incident to the total destruction, at death, of the capacity to carry on life's activities, then in the case of a decedent who was subject to the expense of maintaining himself there must be deducted from what would otherwise be fair compensation the reasonable expense of personal living during the probable duration of his lifetime. This is not to be confused with any rule that the damages for destruction of earning capacity are to be measured by the probable net savings or accumulations of the decedent during his lifetime. We have unequivocally rejected any such rule. *Chase* v. *Fitzgerald,* 132 Conn. 461, 469, 45 A.2d 789; *Mickel* v. *New England Coal & Coke Co.,* 132 Conn. 671, 675, 47 A.2d 187. To avoid misunderstanding, however, we parenthetically point out that evidence as to savings is admissible as part of the over-all picture of the decedent's activities which the parties in a wrongful death action are permitted to portray. *McKirdy* v. *Cascio,* 142 Conn. 80, 85, 111 A.2d 555. In the case of a decedent who is subject to the expense of maintaining himself, the probable cost of future personal living expenses must be deducted from the allowance otherwise made as reasonable compensation for the total destruction of his capacity to carry on life's activities, and this is so whether or not the sum total of his life's activities included any substantial capacity to earn money. While it is correct to say, as was said in *McKirdy* v. *Cascio,* supra, that a "wage earner or a salaried man is subject to the expense of maintaining himself," obviously the observation is not limited to wage earners or salaried persons. Other persons may be, and often are, subject to the same expense, including businessmen

like this decedent, professional men, or persons maintaining themselves on unearned income or savings.

The phrase "personal living expenses" has never been exactly defined, and because of its inherent nature probably it never can be. It refers to those personal expenses which, under the standard of living followed by a given decedent, it would have been reasonably necessary for him to incur in order to keep himself in such a condition of health and well-being that he could maintain his capacity to enjoy life's activities, including the capacity to earn money. Personal expenses would not ordinarily include recreational expenses, nor that proportion of living expenses properly allocable to the furnishing of food and shelter to members of his family other than himself. The whole problem of assessing damages for wrongful death, however, defies any precise mathematical computation. *O'Connor* v. *Zavaritis,* 95 Conn. 111, 117, 110 A. 878. Therefore, in a charge, theoretical lack of precision in the definition and application of any particular factor involved in the assessment of damages under our rule could seldom, in itself, constitute harmful error. In the instant case, it is true, as pointed out by the plaintiff, that the court was technically in error in charging, in effect, that the decedent's expenses for recreation and hobbies should be deducted as "personal living expenses" in arriving at the allowance of damages for the destruction of earning capacity, and in refusing the substance of a request to charge which would have more precisely excluded from personal living expenses the cost of maintenance of the decedent's wife and children. However, because of the impossibility of making any exact mathematical computation of either of the elements under discussion, to say noth-

ing of making an exact computation of other elements entering into the calculation of damages for wrongful death, the errors cannot be considered material, in view of the charge as a whole.

Of course, in connection with the damages for the destruction of the capacity to carry on life's activities apart from any question of destruction of earning capacity, evidence as to the decedent's hobbies and recreations would be admissible and, to the extent that the proof warranted, would presumably operate to enhance the amount of the verdict. *Fairbanks* v. *State,* 143 Conn. 653, 659, 124 A.2d 893.

It was not error that, prior to giving our rule as to the assessment of damages, the court cautioned the jury that the damages were not to be measured by the loss, sentimental or financial, to the decedent's wife and children. *Lengel* v. *New Haven Gas Light Co.,* 142 Conn. 70, 78, 111 A.2d 547. This brought out the distinction between the measure of damages under a wrongful death statute based on Lord Campbell's Act and that under a statute such as our own, which merely adds the element of death, with its attendant losses, to the damages which the decedent could have recovered if he had lived. It may be conceded that our rule gives no mathematical formula which the trier can apply. This, however, is a shortcoming inherent in the problem. It may not be inappropriate to point out that our law often works out much more fairly than do statutes patterned on Lord Campbell's Act, where generally no damages at all are recoverable for the death of a breadwinner who leaves no surviving dependents. Thus in the all-too-common case where an entire family is killed in a single accident, if the breadwinner survives the other members of his family, even by seconds, generally no damages are recover-

able for his death, in the absence of other dependents. See 2 Harper & James, Torts, § 25.14, p. 1330.

There is no error.

In this opinion the other judges concurred.